**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SEAN MCDERMOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-03529 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ARCELORMITTAL U.S.A., LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Sean McDermott stepped into an uncovered hole and injured his right leg and right shoulder while cleaning debris from a blast furnace. He subsequently sued Defendant ArcelorMittal U.S.A., LLC ("AMUSA"), the owner of the steel mill where he was injured, and Defendants Code Red Safety and Rental, LLC ("Code Red"), GM Safety and Supply, LLC ("GM Safety"), and Solid Platforms, Inc. ("Solid Platforms"), each of which allegedly provided safety or construction services for the project. McDermott's Second Amended Complaint ("SAC") alleges that Defendants negligently caused his injuries through various acts and omissions. (Dkt. No. 23.) Now before the Court is Code Red's motion for summary judgment, in which it contends that it did not owe a duty of care to McDermott and that GM Safety would ultimately be liable for any negligence on the part of Code Red's workers at the site. (Dkt. No. 155.) For the reasons given below, Code Red's motion is denied.

### BACKGROUND

Except where otherwise noted, the following facts are undisputed.

McDermott was a laborer for Roger & Sons Construction, Inc. ("Roger & Sons"). (Solid Platforms's Resp. to Code Red's Statement of Proposed Material Facts ("SRSMF") ¶ 3,[1] Dkt. No. 159; Pl.'s Resp. to Code Red's Statement of Proposed Material Facts ("PRSMF") ¶ 3, Dkt. No. 164.) In October 2016, AMUSA—the owner and operator of a steel mill in Indiana—contracted with entities, including safety service provider GM Safety, to refurbish a blast furnace at its mill. (SRSMF ¶¶ 8–10; PRSMF ¶¶ 8–10.) GM Safety signed a purchase order with AMUSA to provide rescue services, green guardian services, and confined space attendants for the project. (SRSMF ¶¶ 9–11; PRSMF ¶¶ 9–11.)

GM Safety has an affiliate, Code Red, that provides the same kind of safety services as GM Safety. (Code Red's Resp. to Pl.'s Statement of Additional Facts ("Code Red's Resp. PSAMF") ¶¶ 22–23, Dkt. No. 167.) Code Red developed a Rescue Pre-Plan, dated October 18, 2016, for work at the AMUSA blast furnace. (Id. ¶¶ 7–10.) The document is presented on Code Red letterhead, was completed by the "Code Red Rescue Team," and bares a specific job number. (Code Red's Resp. to Solid Platforms's Statement of Additional Facts ("Code Red's Resp. SP SAMF") ¶ 12, Dkt. No. 168; Solid Platforms's Statement of Additional Facts ("SP SAMF"), Ex. H at 351–54, Rescue Pre-Plan, Dkt. No. 161.) GM Safety and Code Red are both partly owned by Robert Tepperman and have the same principal office address. (Code Red's Resp. PSAMF ¶ 21; Code Red's Resp. SP SAMF ¶¶ 1–2.) The parties dispute whether GM Safety and Code Red are

---

[1] In addition to McDermott, Solid Platforms filed its own response to Code Red's motion. (Solid Platforms's Resp., Dkt. No. 160.) McDermott alleges that Solid Platforms is in the business of providing scaffold systems and general carpentry services, and that AMUSA contracted with Solid Platforms for work on the repair or refurbishment of the blast furnace. (SAC ¶¶ 5, 8.) On August 17, 2018, Solid Platforms filed a counterclaim for contribution against AMUSA, GM Safety, and Code Red. (Solid Platforms's Countercl., Dkt. No. 44.) That counterclaim, and all other contribution counterclaims, were dismissed by stipulation of the parties on October 16, 2018. (Dkt. No. 72.)

"sister companies," though they agree that GM Safety and Code Red are separate entities (Code Red's Resp. PSAMF ¶ 20; PRSMF ¶ 8).

On October 19, 2016, McDermott was working to refurbish the blast furnace at AMUSA's Indiana facility. (SRSMF ¶ 3; PRSMF ¶ 3.) At the mill, McDermott fell through an uncovered hole in the furnace and injured his right leg and right shoulder. (SRSMF ¶ 4; PRSMF ¶ 4.)

On December 4, 2017, McDermott brought this case against AMUSA and Code Red claiming negligence. (Notice of Removal, Ex. 3 at 16–20, Dkt. No. 1.) McDermott subsequently amended his complaint twice, adding as defendants GM Safety and Solid Platforms, another entity involved in the refurbishment project. (Notice of Removal, Ex. 1 at 8–12, Dkt. No. 1; SAC.) In the SAC, McDermott contends that his injuries resulted from negligence on the parts of AMUSA, GM Safety, Code Red, and Solid Platforms. (SRSMF ¶¶ 5–7; PRSMF ¶¶ 5–7.)

In seeking summary judgment in its favor, Code Red argues that it did not owe McDermott a duty of care—a necessary element of any negligence claim. Code Red further contends that, even if its workers at the mill did negligently cause McDermott's injuries, the doctrine of *respondeat superior* does not apply to Code Red here and, instead, GM Safety is liable for their negligence.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the nonmovant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). While the Court construes all facts and reasonable inferences in the light most favorable to the nonmovant, "favor toward the nonmoving party does not extend to drawing

inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013). "[T]he mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

McDermott asserts claims for negligence against Code Red and the other Defendants. All parties have stipulated that McDermott's claim is governed by Indiana law. (Stipulation, Dkt. No. 72.) Under Indiana law, a plaintiff must establish three elements to show negligence: (1) the existence of a duty on the part of the defendant to conform to a standard of care arising from its relationship with the plaintiff; (2) the failure of the defendant to conform its conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by that failure. *Tibbs v. Huber, Hunt & Nichols, Inc.*, 668 N.E.2d 248, 250 (Ind. 1996). "A negligence action is rarely an appropriate case for disposal by summary judgment." *Carroll by Carroll v. Jagoe Homes, Inc.*, 677 N.E.2d 612, 615 (Ind. Ct. App. 1997). Instead, issues of negligence, causation, and reasonable care are "most appropriately left for a determination by the trier of fact." *Id.*

## I.    Duty of Care

Code Red's primary argument for summary judgment is that it did not owe a duty of care to McDermott. "Absent a duty, there can be no breach, and therefore, no negligence." *Helton v. Harbrecht*, 701 N.E.2d 1265, 1267 (Ind. Ct. App. 1998). The existence of a duty is a question of law for the court to decide. *Tibbs*, 668 N.E.2d at 250. Although "[t]he jury does, of course, do the fact-finding necessary to such a determination." *Id.* "Courts will generally find a duty where reasonable persons would recognize and agree that it exists." *Est. of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind. 2003). To determine whether a common law duty exists, Indiana courts

conduct a balancing test involving the following factors: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991).

In addition, "[w]here an independent contractor is in control of the construction or premises and the independent contractor's negligence results in injury to another person on the premises, the independent contractor may be held liable under Indiana law." *Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd. P'ship*, 859 F. Supp. 1189, 1196 (N.D. Ind. 1994) (applying Indiana law). This principle applies equally to contractors and subcontractors. *See, e.g.*, *Guy's Concrete, Inc. v. Crawford*, 793 N.E.2d 288, 295 (Ind. Ct. App. 2003) (finding that subcontractors owed duty of care to the plaintiff because subcontractors were completing work and had control of premises, and the plaintiff was rightfully on premises). To determine whether an independent contractor owed a duty of care under such circumstances, a court must consider (1) whether the defendant was performing work and in control of the construction or premises, and (2) whether the plaintiff was rightfully on the premises. *Horine v. Homes by Dave Thompson, LLC*, 834 N.E.2d 680, 684 (Ind. Ct. App. 2005).

It is undisputed that three of Code Red's workers provided safety services at AMUSA on October 19, 2016, but Code Red nonetheless maintains that it was not a contractor or subcontractor. Instead, according to Code Red, it merely loaned its workers to GM Safety on the relevant date in order for GM Safety to comply with its Purchase Order obligations. Code Red further argues that, unlike other entities, Code Red did not sign any written contracts with AMUSA or GM Safety. As a result, Code Red asserts that it cannot be deemed a contractor or subcontractor and it does not owe a duty of care. The Court disagrees, however, and finds that

there are disputed issues of fact as to whether Code Red was a contractor or subcontractor on AMUSA's furnace project.

To start, three of Code Red's workers were on site on October 19, 2016. (Code Red's Resp. PSAMF ¶¶ 1, 5, 12, 14.) Some of those workers testified that they believed they were working as Code Red laborers on that date. (Code Red's Resp. SP SAMF ¶¶ 13, 14 ("Q: Did you work at the [AMUSA facility] during the October 2016 outage? A: Yes, I did. Q: What organization did you work under? A: Code Red Safety.").) Moreover, Code Red devised a written "Rescue Pre-Plan," dated October 18, 2016, that detailed safety work to be performed for the blast furnace restoration. (SP SAMF, Ex. H, Rescue Pre-Plan at 351–54, Dkt. No. 161.) As noted above, that document was created on Code Red letterhead, was completed by the Code Red Rescue Team, and listed a specific job number for the project. (*Id.*) Further, the Rescue Pre-Plan includes the names of two of the Code Red workers who were on-site at AMUSA, and even identifies "Mittal," or AMUSA, as Code Red's client. (*Id.*) This evidence supports a reasonable inference that Code Red was doing more than simply lending its workers to GM Safety—notably, the client listed in the Rescue Pre-Plan is "Mittal," ***not*** GM Safety. At minimum, this evidence creates an issue of fact as to whether Code Red had a contractual relationship with AMUSA regarding the provision of safety services on October 19, 2016. In short, the Court finds an issue of fact regarding whether Code Red was a contractor (or subcontractor) on the project.

Viewing the evidence in the light most favorable to McDermott, the Court presumes, for present purposes, that Code Red was a contractor on the project and proceeds to apply the factors listed in *Horine* to determine whether it owed a duty of care to McDermott. The Court first considers whether Code Red was performing work and in control of the construction or premises. *Horine*, 834 N.E.2d at 684. Here, "[t]he issue is not whether [the defendant] had complete

6

authority over the construction site or authority to limit persons from visiting the site. Rather, the issue is more appropriately stated as whether [the defendant] had control over the construction alleged to be the cause of the injuries at issue . . . ." *Guy's Concrete*, 793 N.E.2d at 295 (finding that subcontractors with "some control" over construction or premises can owe a duty of care).

The evidence in the record shows that Code Red's workers were both performing work at AMUSA and in control of the construction alleged to have injured McDermott. First, Code Red admits that its workers were conducting safety services on site on October 19, 2016. (Code Red's Resp. PSAMF ¶¶ 1, 5, 12, 14.) Second, Code Red had control of the premises and the hole that allegedly caused McDermott's injuries. Code Red's workers' duties, after all, included maintaining the safety of the site, and one individual's job was patrolling the work site looking for tripping hazards. (Code Red's Resp. PSAMF ¶¶ 17–18; SP SAMF, Ex. H at 351–54, Rescue Pre-Plan.) Further, no GM Safety supervisors were present on the date in question. (Code Red's Resp. PSAMF ¶¶ 25–26.) In this way, Code Red workers were effectively in charge of themselves and the safety of the premises. For these reasons, the first part of the *Horine* analysis is satisfied.

The evidence also establishes that McDermott was rightfully on the premises. To be sure, neither party contends otherwise. But the Court must also consider whether it was foreseeable that McDermott would visit the premises and be harmed by falling in the hole. *See Rider v. McCamment*, 938 N.E.2d 262, 269 (Ind. Ct. App. 2010). "[T]he foreseeability component requires a general analysis of the broad type of plaintiff and harm involved without regard to the facts of the actual occurrence." *Guy's Concrete*, 793 N.E.2d at 296. McDermott's visit to the premises was altogether foreseeable, as he was a worker charged with refurbishing the blast furnace. (PRSMF ¶¶ 3–4.) Code Red understood that other refurbishing workers would be present on the site—that was, of course, one of its reasons for providing safety services. (PRSMF ¶ 18; Code

Red's Resp. PSAMF ¶¶ 3–4, 17.) And harm to a worker from tripping into a hole was foreseeable as well. The Rescue Pre-Plan, for example, recognizes that there could be slip, trip, and fall hazards in the furnaces, and one Code Red worker's job was to uncover any tripping hazards. (Code Red's Resp. PSAMF ¶¶ 10, 17–18.) A hole would create such a hazard. Since McDermott's presence and injury was broadly foreseeable, McDermott was rightfully on the premises on October 19, 2016.

In sum, viewed in the light most favorable to McDermott as the non-moving party, the record supports the conclusion that Code Red owed a duty of care to McDermott on the date in question. There is at least a disputed issue of fact on the issue.

## II.    Borrowed Servant Doctrine

The Court next turns to Code Red's contention that it cannot be held liable for any negligence on behalf of its workers because it lent its workers to GM Safety and, pursuant to the borrowed servant doctrine, GM Safety became liable for their negligence.

Under the doctrine of *respondeat superior*, "a master is liable for the physical torts which his servant commits while acting within the scope of the servant's employment." *Johnson v. Motors Dispatch, Inc.*, 360 N.E.2d 224, 228 (1977). Indiana also recognizes the borrowed servant doctrine, which provides that "an employee while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of *respondeat superior*." *Progressive Const. & Eng'g Co. v. Indiana & Michigan Elec. Co.*, 533 N.E.2d 1279, 1284 (Ind. Ct. App. 1989) (quoting *New York Cent. R. Co. v. N. Indiana Pub. Serv. Co.*, 140 Ind. App. 79, 84, 221 N.E.2d 442, 446 (1966) ("*NIPSCO*")). The term "special employer" refers to the entity that borrows workers from another entity, while the moniker "general employer" refers to the entity from which those loaned workers

come. *Id.* Here, Code Red contends that GM Safety was the special employer of Code Red's safety workers on the blast furnace project.

To determine whether a servant has been "borrowed" such that liability shifts, a court must apply three tests: (1) the "whose business" test, which asks whether the tortfeasor was furthering the business of the general employer or the special employer; (2) the "control" test, which assesses which entity had the right to control the act in question; and (3) the "scope of business" test, which determines whether the work conducted by the tortfeasor fell into the scope of business of the general employer or the special employer. *Id.* "Although the articulation of these tests implies that courts must choose between the two employers in allocating *respondeat superior* liability, Indiana law provides for the possibility of both employers being liable for the negligence of 'borrowed servants.'" *Yeary v. United States*, 921 F. Supp. 549, 555 (S.D. Ind. 1996). But, "[g]enerally, the question of which employer is liable for the servant's negligence is a question for the trier of fact." *Williams v. R.H. Marlin, Inc.*, 656 N.E.2d 1145, 1154 (Ind. Ct. App. 1995). As discussed below, the record contains facts that point toward either Code Red or GM Safety, individually or jointly, as being responsible for the workers' actions on the AMUSA site. When such is the case, "the trier of fact should be given the opportunity to determine the relationship between the parties." *Id.* at 1155.

### A.    "Whose Business" Test

With respect to the "whose business" test, a reasonable fact-finder could conclude that the provision of safety services by Code Red workers benefitted Code Red's business, GM Safety's business, or both. There is evidence in the record supporting that Code Red's workers' provision of safety services at the site helped GM Safety satisfy its own obligations pursuant to its Purchase Order with AMUSA. (Code Red's Statement of Material Facts ("CRSMF"), Purchase Order, Ex.

D at 2–5, Dkt. No. 157-4 (describing job as "provid[ing] confined space services").) But, as this Court has already concluded, there is a dispute of fact as to whether Code Red also maintained a contractor relationship with AMUSA. Evidence such as the "Rescue Pre-Plan" created by Code Red suggests that the entity had its own business objectives at the site. (SP SAMF, Ex. H, Rescue Pre-Plan at 351–54.) For these reasons, there are disputed issues of fact as to "whose business" was being furthered.

### B.    "Control" Test

As for the "control" test, a reasonable fact-finder could conclude that Code Red employees were in control of the acts in question, particularly because no GM Safety personnel were anywhere on site. (SRSMF ¶ 14 ("None of GM Safety's own employees were at the [AMUSA] site at the time of the Alleged Incident."); PRSMF ¶ 14 (same).) Without GM Safety workers or supervisors to guide the Code Red workers' actions, those Code Red workers were essentially in charge of themselves and the safety of their environment.

Although Code Red notes that some of its on-site workers believed they were working for GM Safety, and that one worker turned in her weekly timesheet to GM Safety, this is not sufficient evidence to establish as a matter of law that GM Safety controlled the acts in question. For example, Code Red workers' belief that they were working for GM Safety does not necessarily mean that GM Safety dictated the workers' actions or controlled their on-site work. Code Red offers no evidence that GM Safety ever instructed the Code Red workers about their responsibilities, let alone that GM Safety personnel was present at the mill on the date in question. Further, though some cases look to which entity paid and had the right to discharge workers for purposes of the "control" test, *Williams*, 656 N.E.2d at 1152, Code Red provides little proof of either. Code Red highlights its worker Jeanette Jarrad's testimony that she supplied a timesheet to

GM Safety. (SP SAMF, Ex. D at 109–10, Dep. Tr. of J. Jarrad, Dkt. No. 161.) But that alone does not establish that GM Safety paid her or Code Red workers for their work.

### C.    "Scope of Business" Test

Turning to the "scope of business" test, the work conducted by Code Red personnel fell under the scope of business of both GM Safety and Code Red. This conclusion boils down to the two entities offering the same safety services, such as supplying safety supervisors, confined space attendants, and rescue personnel (Code Red's Resp. SP SAMF ¶¶ 22–23), which were the very services that the Code Red workers were providing at the steel mill. (*Id.* ¶¶ 2, 7, 15.) Given that the Code Red personnel at the AMUSA site offered work falling under the purview of both businesses, the "scope of business" test points to both GM Safety and Code Red.

### D.    Balance of Tests

Because a reasonable fact-finder could find that *either* GM Safety or Code Red was the employer of the Code Red workers at the time of the incident under two of the relevant tests, and the third test points to *both* entities as the workers' employer, the Court finds this issue not suitable for disposition by summary judgment.

### CONCLUSION

For the reasons stated above, there are disputed issues of fact as to whether Code Red owed a duty of care to McDermott and as to whether Code Red or GM Safety should be considered the employer of Code Red's employees who were on site at the time of the incident. Accordingly, Code Red's motion for summary judgment (Dkt. No. 155) is denied.

ENTERED:

Dated: September 30, 2022

_____
Andrea R. Wood
United States District Judge

11